# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Daniel A. Rassier and Rita Rassier, <br><br> Plaintiffs, <br><br> v. <br><br> John L. Sanner; Pam Jensen; Ken McDonald; and Stearns County, Minnesota; <br><br> Defendants. | Civil No. 17-938 (DWF/LIB) <br><br> **MEMORANDUM OPINION AND ORDER** |

Devon M. Jacob, Esq., Jacob Litigation, and Michael B. Padden, Esq., Padden Law Firm, counsel for Plaintiffs.

Andrew A. Wolf, Esq., Jason M. Hiveley, Esq., and Stephanie A. Angolkar, Iverson Reuvers Condon, counsel for Defendants Sanner, Jensen, and Stearns County.

Janine Wetzel Kimble, Esq., Noah Lewellen, Esq., Office of the Minnesota Attorney General, counsel for Defendant McDonald.

## INTRODUCTION

This matter is before the Court on Defendants' motion to dismiss or for summary judgment. (Doc. No. 103.) For the reasons discussed below, Defendants' motion is granted.

## BACKGROUND

This case involves alleged wrongs caused by the decision to label Plaintiff Daniel A. Rassier ("Dan Rassier") a person of interest for the infamous child kidnapping

of Jacob Wetterling.[1]  Plaintiffs Dan Rassier and Rita Rassier (referred to as simply "Rassier" or "Dan Rassier") filed suit against Stearns County, John Sanner (the county sheriff), Pam Jensen (a sheriff's captain), and Ken McDonald (an investigator for the Minnesota Bureau of Criminal Apprehension ("BCA")) for various state-law and constitutional claims.

In an order dated November 30, 2017 (the "November 2017 Order"), the Court dismissed several of Rassier's claims, namely those based on allegedly unlawful searches in 2010.  (Doc. No. 46.)  The Court allowed four claims to advance:  First Amendment retaliation, intentional infliction of emotional distress ("IIED"), and defamation, to the extent that these claims are based on former Stearns County Sheriff John Sanner's decision to label Dan Rassier a person of interest, as well as a claim for municipal liability insofar as it parallels the First Amendment retaliation claim.[2]

Defendants move to dismiss or for summary judgment on all remaining claims.  Specifically, Defendants assert that all of Rassier's claims are time-barred, that Rassier has failed to establish the essential elements of the claims, and/or that Defendants are entitled to qualified immunity and privilege for each claim.  The Court incorporates the facts recited in the prior order and offers a summary plus additional facts herein.

---

[1]  The Court feels compelled at the outset to note that, despite experiencing unfathomable tragedy, Jacob's mother, Patty Wetterling, became a tireless advocate for the safety of children.  Through her advocacy, she has made communities safer for all children.

[2]  In the November 2017 Order, the Court dismissed all claims brought against McDonald with prejudice.  (Doc. No. 48 at 18.)

2

On October 22, 1989, Jacob Wetterling was abducted, sexually assaulted, and murdered by Danny Heinrich. (Doc. No. 109 ("Wolf Aff.") ¶ 2, Ex. 1.) Jacob Wetterling was taken at the end of the driveway on Robert and Rita Rassier's 168-acre farm in St. Joseph, Minnesota (the "Rassier Property"). (*Id*.) On that day, Dan Rassier, the son of Robert and Rita, was 34 years old and home alone at the Rassier Property. Dan Rassier saw a car turning around in the driveway near the time that Jacob Wetterling was abducted. (*Id*.) Dan Rassier spoke to investigators, but the Rassier Property was not thoroughly searched at the time. (*Id*.; Wolf Aff. ¶ 3, Ex. 2 ("Sanner Dep.") at 165-66.) That same day, the FBI was called in to assist with the investigation. (Wolf Aff. ¶ 4, Ex. 3.) The case remained unsolved until 2016 when Danny Heinrich confessed. (Wolf Aff. ¶ 5, Ex. 4.)

In the Amended Complaint (Doc. No. 29 ("Am. Compl.")), Rassier asserts that Jacob Wetterling's abductor had been in St. Joseph on the afternoon of his disappearance, "trolling for a victim when he accidentally stumbled onto the [Rassier] property." (Am. Compl. ¶¶ 55-56.) Rassier alleges that the perpetrator drove a tan, full-size vehicle down the property's long driveway, turned around in the yard near the farmhouse, and left at an extremely high rate of speed. (*Id*. ¶¶ 57-59.) Rassier alleges that later that same evening, he saw a second blue sedan-type vehicle drive down the driveway and turn around in the yard near the farmhouse, again at an extremely high rate of speed. (*Id*. ¶ 73.) Rassier asserts that the driver "exhibited the same driving pattern," and Rassier was confident that the two different vehicles were driven by the same person. (*Id*. ¶¶ 75, 76.) Rassier

3

immediately shared this "two-car theory" with investigators. (Wolf Aff. ¶ 6, Ex. 5 ("D. Rassier Dep.") at 30-31.)

In November 2002, more than thirteen years after Jacob Wetterling's kidnapping, Sanner was elected sheriff of Stearns County, and he assumed office in January 2003. (Wolf Aff. ¶ 7, Ex. 6; Sanner Dep. at 11.) Sanner had been working in law enforcement with Stearns County since 1984. (Sanner Dep. at 8.) Solving the Wetterling kidnapping was a priority for him. (*Id*. at 44-45.) Jensen became a detective in the Stearns County Office in 2000 and was assigned to the Jacob Wetterling investigation, and she continued as the lead investigator when she was promoted to Captain in 2004. (Wolf Aff. ¶ 8, Ex. 7 ("Jensen Dep.") at 9-12, 31, 38.)

Evidence in the record demonstrates that Heinrich was known to the Stearns County Sheriff's Office ("SCSO") because he was investigated regarding a sexual assault of another boy, and that shoe prints and tire tracks later identified as belonging to him were similar to those found on the Rassier's driveway. (Jensen Dep. at 39; Doc. No. 126 ("Padden Decl.") ¶ 2, Ex. 2 ("Ball FBI Aff.") at 7-8; Sanner Dep. at 22-23 (testifying that plaster casts of footprints and tire tracks were taken from the Rassier driveway, and that in 1989-1990 the shoe prints and tire tracks were identified as "similar to" an individual identified as Heinrich).) Heinrich was questioned and could not be eliminated as a suspect. (Sanner Dep. at 28; Jensen Dep. at 39.) The FBI issued reports in 1990 noting that the shoeprints and tire tracks potentially matched those of Heinrich. (Ball FBI Aff. at 7-8 (explaining that non-unique "class characteristics" of size, shoe pattern and tread pattern of Heinrich's shoes appeared to be the same as the print found on the driveway,

4

and that Heinrich's tires were consistent in size and shape as the tracks on the driveway).) Rassier also submits that despite knowing this as early as 1990, Sanner did not disclose this information to the public. (Sanner Dep. at 46-47 (acknowledging that Heinrich was on the radar early in the investigation); 196-98 (acknowledging that the information regarding Heinrich was not disclosed to the public).)

In the fall of 2003, investigators identified a driver (Kevin Hamilton) who turned around in the Rassier's driveway on the night of Jacob Wetterling's abduction. (Wolf Aff. ¶¶ 9, 12, Exs. 8, 11; Jensen Dep. at 48-50.) Defendants claim that this new evidence gave investigators a new possibility—that perhaps Jacob Wetterling was not taken in a car. (Jensen Dep. at 55, 59-60; Wolf Aff. ¶ 11, Ex. 10 ("McDonald Dep.") at 49, 51, 54, 72).) This theory is referred to as the "abduction-on-foot theory."[3]

On February 23, 2004, Rassier appeared in a television interview with a Fox9 television reporter, Trish Van Pilsum, during which he shared the two-car theory, explained his involvement in the investigation, revealed that he had participated in an interview with Jensen and McDonald, and criticized investigators' failure to conduct a thorough search of the Rassier Property. (D. Rassier Dep. at 18-19, 68-70, 78-79; Wolf Aff. ¶ 13, Ex. 12 (Fox9 News "Man Questioned in Wetterling Case," February 23,

---

[3] Rassier maintains that when he asked what type of car Hamilton was driving, the initial description given to him by the police did not match the two cars he saw; but also that he later found out that the initial description given to him was wrong. (D. Rassier Dep. at 32.)

5

2004.)[4] During the interview, Rassier stated that he was a "suspect" in the Wetterling investigation, although Fox9 indicated that Stearns County authorities did not use that term. (Wolf Aff. ¶ 13, Ex. 12; D. Rassier Dep. at 78-79 (acknowledging that it is possible that he told Trish Van Pilsum that he'd recently become a suspect).) Rassier's face was blocked out in the story, but the content of the interview suggested his identity or at least made it discoverable. (*Id.*; Sanner Dep. at 99.) The story also indicated that Stearns County was moving away from the two-car theory.[5]

Soon after the Fox9 interview, Sanner met with Jacob Wetterling's mother, Patty Wetterling, at which time he "explained the essence of the abduction on foot theory," and told Patty Wetterling that Hamilton's tires could possibly explain the tire tracks on the Rassier's driveway. (Sanner Dep. at 122.) In explaining the possibility that the abduction was accomplished on foot, he also indicated that a local person could be responsible. (*Id.* at 124.) In May 2004, another news story ran on television connecting

---

[4] Rassier made similar complaints in previous conversations with Jensen and McDonald. (Sanner Dep. at 161-162, 180-181; Jensen Dep. at 103.) Sanner was aware of the criticism and agreed with it, acknowledging that a search was not done early on and that investigators would have to remedy that. (Sanner Dep. at 165-66.)

[5] Rassier asserts that Sanner withheld from the investigation team the fact that he was the source for the Fox9 news story. Sanner testified that he could have been a partial source for the story because he was sharing with the media the fact that they had refocused the investigation to look at possible suspects on foot with the media. (Sanner Dep. at 95-96.) One of Rassier's theories in this case is that Sanner was engaged in a "scam" that involved him not revealing the "known internal reality" about the shoe and tire tracks (that they matched those of Heinrich), keeping from his investigative team the fact that he "had tethered this nonsensical [abduction-on-foot] theory to the media," and eventually to fool Patty Wetterling to get her "on the same page and locked into his bizarre theory." (Doc. No. 121 at 5.)

6

the abduction and sexual assault of another young boy in the area ten months before Jacob Wetterling disappeared. (Padden Decl. ¶ 3, Ex. 3 (partial transcript of May 2004 television story on Twin Cities, NBC Affiliate, Channel 11).) Patty Wetterling is quoted in the story saying: "It's almost unfathomable to believe that somebody right here took Jacob and has been here all along. . . [e]ven the possibility of there being no car . . . it changes everything." (*Id.*)

Years later, in 2009, Patty Wetterling approached investigators with a proposal to set up an encounter with Dan Rassier, during which Patty Wetterling would wear a wire and ask Rassier questions about what happened to Jacob Wetterling. (Wolf Aff. ¶ 14, Ex. 13 ("P. Wetterling Dep.") at 42-49.)[6] Patty Wetterling then met with Rassier and recorded their conversation. (Wolf Aff. ¶ 15, Ex. 14.) During their conversation, Rassier was critical of the investigation, calling the police and FBI "idiots" numerous times. (*Id.*; P. Wetterling Dep. at 42.) He also told Patty Wetterling about his two-car theory, stated that he knew that the driver of the car was the person who abducted Jacob, expressed fear that Jacob's body was buried on his property, and questioned Patty Wetterling about what details about the abductor the boys with Jacob had provided to law enforcement. (Wolf Aff. ¶ 15, Ex. 14.) Rassier also criticized the current investigators, calling them "big

---

[6] Rassier asserts that law enforcement convinced Patty Wetterling to covertly record him. McDonald stated in his deposition that he did not remember whose idea it was to do the recording but that "it could have been" one of the investigators. (McDonald Dep. at 74-75.) However, in her deposition, Patty Wetterling stated that the idea to wear a wire was hers and that law enforcement "cooperated" with her. (P. Wetterling Dep. at 41-42.) And while Sanner was aware of the plan, he claims that he was not involved in its planning or execution. (Sanner Dep. at 159, 167; Doc. No. 112 ("Sanner Decl.") ¶ 10.)

bullies," "idiots," and liars who "completely screw[ed] up" the investigation. (*Id*.) Speaking about Sanner specifically, Dan Rassier stated that "Sheriff Sanner saying we are closer than ever to solving this case. That should tell you almost right there, they are . . . they're just, they're lost." (*Id.* at 680.)

Sanner claims that he neither listened to an audio nor viewed a transcript of Patty Wetterling's conversation with Raisser. (Sanner Decl. ¶ 10; Sanner Dep. at 166-67.) Instead, Jensen briefed Sanner on the conversation (*id*.), and Jensen denies that she provided the transcript of the interview to Sanner and states that she did not inform him of Rassier's criticisms of the investigation. (Doc. No. 110 ("Jensen Decl.") ¶¶ 1, 2, 8, 9.) There is no dispute, however, that Sanner and Jensen were aware, generally, of Rassier's criticism of law enforcement. (Sanner Dep. at 161, 180; Jensen Dep. at 99, 102.)

During the summer of 2010, investigators obtained warrants to search the Rassier Property for evidence related to the Wetterling crime. (Wolf Aff. ¶ 16, Ex. 15.) On June 30, 2010, investigators from Stearns County, the FBI, and the BCA began executing the warrants. (Wolf Aff. ¶¶ 17-19, Exs. 16-18.) Several media outlets covered the search. (Sanner Dep. at 178.) Stearns County attempted to keep the Rassier name out of coverage. (Sanner Decl. ¶ 8; Wolf Aff. ¶¶ 17-19, Exs. 16-18.)

In July 2010, Dan Rassier spoke with Kari Petrie, a St. Cloud Times reporter. (Wolf Aff. ¶ 20, Ex. 19.) Dan Rassier indicated that he supported the search of his family's property and indicated that he would help authorities. (*Id*.) Rassier stated that he had been interviewed numerous times, submitted to a lie-detector test and hypnosis,

and provided DNA. (*Id*.) He also explained how the media attention was negatively affecting him and his family. (*Id*.)

Kari Petrie called Sanner at home, told him that she had spoken to Dan Rassier, and explained that he had outlined his involvement in the investigation over a number of years. (Sanner Dep. at 177-79.) Petrie asked for confirmation of details, but Sanner declined to give specifics, citing the ongoing open investigation. (*Id*. at 179.) Petrie then asked Sanner that "[w]ith everything that Dan Rassier just told us, would you consider him a suspect?" (*Id*.) Sanner thought for a second and said "No. That's not what I would consider him." (*Id*.) Petrie followed up by asking, "Then what would you consider him?" (*Id*.) Sanner stated: "And it seemed, number one, very obvious to me that he was at least a person of interest." (*Id*.) Sanner stated in his deposition that he thought that term "was a step back or minimizing his potential involvement." (*Id*.)[7] Sanner further explained that referring to Dan Rassier as a suspect could potentially jeopardize his safety. (Sanner Dep. at 183-84, 98.) Sanner testified that he thought "person of interest" could be someone investigators were looking at, but not necessarily as a perpetrator. (Sanner Dep. at 183-84.)[8]

---

[7]   Defendants maintain that Dan Rassier was, in fact, considered a suspect internally even before Sanner assumed office and certainly with respect to the abduction-on-foot theory. (Sanner Dep. at 183-84; Jensen Dep. at 61, 80-81; Wolf Aff. ¶ 10, Ex. 9 ("Winkels Dep.") at 32, 36, 44; McDonald Dep. at 51; Wolf Aff. ¶ 2, Ex. 1 at 10, 16-20.)

[8]   The Court is highly skeptical of Sanner's claim that the term of "person of interest" would not be understood by the public to be a suspect. However, any such discrepancy in definition does not impact the Court's ruling.

9

On July 1, 2010, the second day of the search of the Rassier Property, Dan Rassier approached Sanner. (D. Rassier Dep. at 33-34, 46-48; Sanner Dep. at 162-63.) Dan Rassier said, "this is really bad"—referring to the search—and claims that Sanner told him, "this is what happens when you talk" and repeated the statement before "he got a convenient phone call and walked away." (D. Rassier Dep. at 33.)[9] At that moment, Dan Rassier claims that he was certain he was being retaliated against for his "frankness and honesty with Patty Wetterling about how—how bad they were, how bad Sanner was, what an idiot he is and was, and Jensen and McDonald. Just complete—I mean, I was— I'm figuring you must have read the transcript to it." (*Id*. at 34-35.) Dan Rassier went on:

> After Sanner said that, it surely started being in my mind, toward the front of my mind that. But it could have been many other things. Talking to even McDonald from 2004 insisting on the two cars and calling them idiots to who knows who. I mean, I –there are things that happened that I don't know if the police were involved or not.

(D. Rassier Dep. at 35.) Rassier stated that he was certain he was being retaliated against on July 1, 2010, and it "became more certain" when he shared his theory with Sanner on July 6, 2010. (*Id*. at 46-47; Wolf Aff. ¶ 21, Ex. 20 ("[I]t seemed obvious to me that the reason the search was happening was because of what I told Patti [sic] Wetterling last October.").) Rassier repeatedly mentioned that he thought he was being retaliated against for speaking with Patty Wetterling. For example, he called the Stearns County

---

[9] Sanner claims he has no recollection of saying this to Dan Rassier. (Sanner Dep. at 163.) The Court is also skeptical of this claim. But again, the veracity of this claim is not material to the Court's decision.

10

Attorney's Office in June 2011, claiming that investigators were retaliating against him because he spoke with Patty Wetterling and inquired about suing investigators and the applicable "statutes" for doing so. (Wolf Aff. ¶ 24, Ex. 23.) In May 2012, Rassier sent a formal complaint letter to various state officials and agencies, claiming, among other things, that law enforcement had violated his civil rights out of retaliation for his critical statements about the investigation. (Wolf Aff. ¶ 25, Ex. 24.) In that letter, Rassier stated that as of July 1, 2010, it was "100% clear that my family and I were being retaliated against for me being honest with Patty Wetterling and informing her how STUPID law enforcement has been." (*Id.*)

Rassier filed the present action on March 29, 2017. The claims remaining are First Amendment retaliation, intentional infliction of emotional distress, and defamation, all to the extent that these claims are based on the labeling of Dan Rassier as a person of interest, as well as a claim for municipal liability that parallels the retaliation claim.

## DISCUSSION

### I. Legal Standards

Defendants move to dismiss, or in the alternative for summary judgment on, all remaining claims. The relevant legal standards are set forth below.

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th

Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Statute of Limitations

Defendants move for summary judgment based on the running of the statute of limitations. As explained in the Court's prior Order, a six-year statute of limitations applies to Plaintiffs' § 1983-First Amendment retaliation claim. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (explaining that courts apply the state statute of limitations for personal-injury torts for § 1983 claims); Minn. Stat. § 541.05 (six year statute of limitations for personal-injury torts in Minnesota); *United States v. Bailey*, 700 F.3d 1149, 1153 (8th Cir. 2012) (noting that the statute of limitations on § 1983 claims is six years in Minnesota). In addition, Rassier's state-law claims—IIED and defamation—are governed by a two-year statute of limitations. Minn. Stat. § 541.07(1); *Songa v. Sunrise Senior Living Invs., Inc.*, 22 F. Supp. 3d 939, 942 (D. Minn. 2014).

Plaintiff's § 1983-First Amendment retaliation claim accrued when Rassier had "a complete and present cause of action." *Wallace*, 549 U.S. at 388. That is, when he could "file suit and obtain relief." *Id*. In this case, Rassier's retaliation claim accrued in 2010 when Sanner named Rassier a person of interest. *See Geka v. Vasiliades*, 814 F.3d 890, 894 (7th Cir. 2016) ("Generally, the statute of limitations clock begins to run on First Amendment retaliation claims immediately after the retaliatory act occurred."). Similarly, Rassier's defamation claim accrued on the date of publication in 2010, *McGovern v. Cargill, Inc.*, 463 N.W.2d 556, 558 (Minn. Ct. App. 1990), and Rassier's IIED accrued on the date of the allegedly tortious act in 2010, *see Krause v. Farber*, 379 N.W.2d 93, 97 (Minn. Ct. App. 1985). In a reversal from the arguments made at the motion to dismiss stage, Rassier now argues that the claims did not accrue in 2010 (when Sanner labelled Dan Rassier a person of interest) but that they accrued in 2016 when Danny Heinrich confessed in open court. Specifically, Rassier argues that without this information, he could not prove his innocence or provide evidence of another perpetrator. The Court disagrees. It is clear to the Court that Rassier's claims, which all relate to him being named a person of interest, accrued when Rassier was so named in 2010.

At the motion to dismiss stage, the Court found Rassier had adequately pleaded that the statute was tolled under the doctrine of equitable tolling. The Court noted that even in cases where a claim has accrued and the statute of limitations has facially run, courts sometimes find that the statute of limitations is tolled for the sake of equity. In such cases, under Minnesota law, a litigant must establish two elements: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in

14

his way and prevented timely filing.'" *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)); *see also Sanchez v. State*, 816 N.W.2d 550, 560 (Minn. 2012) (applying *Holland* test for equitable tolling for state post-conviction relief).[10] Specifically, the Court noted that Rassier alleged that he was unaware of certain false statements in search warrants for the Rassier Property until they were unsealed and of the evidence against Heinrich until his arrest. The Court explained that Rassier alleged that he acted diligently given the circumstances. However, the Court also cautioned that "[e]ven though the Court declines to dismiss the case on statute-of-limitations grounds, Defendants may be able to demonstrate after discovery that tolling is not warranted." (November 2017 Order at 9 n.6.)

The Court now finds, after the benefit of discovery, that equitable tolling does not apply. Rassier maintains that equitable tolling applies because until Heinrich was arrested and the warrants were unsealed, he only speculated that he was being retaliated against. The record, however, belies Rassier's argument. The evidence clearly shows

---

[10] Defendants submit that the only general equitable tolling exception that is recognized under Minnesota law is for fraudulent concealment. *See Lamere v. St. Jude Med., Inc.*, 827 N.W.2d 782, 788 (Minn. Ct. App. 2013); *see also Herrmann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn. 1999) (noting that the statute of limitations begins to run when the cause of action will survive a motion to dismiss for failure to state a claim and does not depend on the ability to ascertain the exact amount of damages; "[t]hus, in the absence of fraudulent concealment, the running of the statute is not tolled by ignorance of the cause of action."). This exception places a higher burden on Rassier than the *Holland* test. Defendants argue that the *Holland* test only applies in habeas cases, and therefore, not here. The Court need not decide whether the *Holland* test is so limited because, as discussed herein, Rassier is unable demonstrate that tolling applies even under the less demanding *Holland* test.

15

that by July 2010, Rassier believed he was being retaliated against for statements made to Patty Wetterling. (Sanner Dep. at 162-63.) He explained that Sanner's retaliation was "crystal clear" or "obvious" to him in July 2010, that he was "certain" he was being retaliated against, and that he became "more certain" as time went on. (D. Rassier Dep. at 46-47.) Unfortunately, the record also demonstrates that Rassier and his family were negatively impacted by his being labeled a person of interest. Further, that Rassier believed as early as July 2010 that he was being retaliated against is supported by the numerous times that he reiterated this belief. For example, in 2011, he told the Stearns County Attorney's Office about his belief that he had been retaliated against for speaking to Patty Wetterling and even asked about suing the investigators and the statutes for doing so. (D. Rassier Dep. at 95.) Later in 2012, Rassier sent a letter to various state officials and agencies, detailing the alleged retaliation that occurred in July 2010. (Wolf Aff. ¶ 25, Ex. 24.) Rassier, however, did not file the present lawsuit until March 29, 2017, more than six years after the alleged retaliation and well beyond the statutory time limits.

In addition, Rassier fails to establish how his retaliation, defamation and intentional infliction of emotional distress claims depended on the discovery of Heinrich's guilt or the information contained in the warrants. For example, Rassier claims that when he saw the search warrant in 2016, "it became clear in my mind right there that I never was a suspect" and that "this is the first time that I had proof . . . [that] I

can use this to prove my case." (Rassier Dep. at 89.)[11]  However, Rassier's belief that he was never a suspect is inapposite.  Rassier's claims in this action are based on him being labeled a person of interest.  Moreover, there is ample evidence in the record that, rightfully or wrongfully, he was considered a person of interest.  Indeed, the record also shows that internally, Dan Rassier was also considered a suspect.  The central issue here is whether Rassier was labeled a person of interest in retaliation for making comments critical of the investigation.  This issue did not hinge on the information in the search warrants or the identity of the true perpetrator.  Again, the record clearly demonstrates that Sanner labelled Dan Rassier a person of interest in 2010, Rassier was aware of the statements in 2010, and Rassier believed at the time that they were retaliatory in nature and suffered negative consequences.  Based on this, Rassier could have filed suit at that time and his claims accrued in 2010.  In addition, Rassier has failed to point to record evidence sufficient to create a genuine issue of material fact as to equitable tolling.  No reasonable juror, on the record before the Court, could conclude that Rassier had been pursuing his rights diligently or that some extraordinary circumstance stood in his way of

---

[11]   Dan Rassier also stated that while he thought he was being retaliated against, he had no evidence.  (D. Rassier Dep. at 95 ("I only can say in my own mind I thought I knew that it could have [been retaliation].  Was I sure?  Could I go out and sue somebody?  No.  I had really nothing except what I thought.  And what I thought meant nothing.")).

17

filing his claims sooner. Having failed to establish that his claims should be equitably tolled, they are untimely and, therefore, properly dismissed.[12]

## CONCLUSION

Based on the foregoing, the Court finds that with the benefit of discovery, it is now apparent that Rassier's claims are barred by the applicable statutes of limitations.[13]

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss or for Summary Judgment (Doc. No. [103]) is **GRANTED**.

2. All remaining claims in the Amended Complaint (Doc. No. [29]) are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 5, 2020  s/Donovan W. Frank
DONOVAN W. FRANK
United States District Judge

---

[12] Because the municipal liability claim parallels Rassier's retaliation claim, it is also untimely. In addition, because the statute of limitations bars all of Rassier's remaining claims, the Court declines to reach Defendants' alternative arguments for dismissal.

[13] As noted above, it is truly unfortunate that Dan Rassier and his family suffered negative impacts after Dan Rassier was named a person of interest, particularly in light of the fact that the case was unsolved for so many years.